UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSEPH C. STOUT, IV                          CIVIL ACTION

VERSUS                                       NUMBER: 10-4466

MICHAEL J. ASTRUE,                           SECTION: "F"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 16, 18).

Joseph C. Stout, IV, plaintiff herein, filed the subject application for DIB on January 18, 2008, with a protective filing date of December 21, 2007, alleging disability as of October 21,

2004. (Tr. pp. 56-59, 69).[1]/ In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as three damaged discs in the back, coronary artery disease, vascular disease, bypass surgery, high blood pressure, stents in both legs, and asthma. (Tr. p. 74).[2]/ Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on February 14, 2008. (Tr. pp. 35-38). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on March 23, 2009 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 39, 10-17). On July 2, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 20-30). The Appeals Council ("AC") subsequently denied plaintiff's request for review

---

[1]/ Plaintiff subsequently amended the alleged onset date to January 23, 2007. (Tr. p. 15).

[2]/ According to a second Disability Report that was filed in the administrative proceedings below, plaintiff had previously filed an application for DIB that was denied at the Appeals Council level on July 13, 2007. (Tr. pp. 69-70). Thereafter, plaintiff filed no lawsuit in this court seeking judicial review of that denial. The effect of plaintiff's failure to do so is that it adversely adjudicated his entitlement to DIB through the date of the ALJ's decision preceding the AC denial, March 19, 2006. 20 C.F.R. §404.981; Muse v. Sullivan, 925 F.2d 785, 787 n. 1 (5th Cir. 1991).

of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1.   [t]he court failed to find peripheral vascular disease as a "severe" impairment at step two (2) of the disability evaluation process, in violation of 20 CFR 404.1521(a), SSR 96-3p, and well established Fifth Circuit case law;

2.   [t]he court should have re-contacted the cardiologist or called a medical expert to testify before rejecting the evidence that plaintiff's disability began prior to his date last insured; and

3.   [t]he court should have used the Grid Rules as a "guideline" and applied them in a "non-mechanical" manner as set forth 20 C.F.R. 404.1563(b) to find that claimant met the Grid requirements as of the date last insured, which was less than six (6) months shy of his 50th birthday, particularly since this claimant has a limited education and his past work was all very heavy.

(Rec. doc. 16-3, p. 1).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant last met the insured status requirements of the Social Security Act on September 30, 2007.

2.   [t]he claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 21, 2004 through his date last insured of September 30, 2007 (20 CFR 404.1571 *et seq*).

3.   [t]hrough the date last insured, the claimant had the

following severe impairments: lumbar spine disc disease, cervical spine disc disease, coronary artery disease (status post coronary artery bypass grafting), hypertension, and chronic obstructive pulmonary disease (20 CFR 404.1520(c)).

4. [[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. [a]fter careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a).

6. [t]hrough the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. [t]he claimant was born on March 3, 1958 and was 49 years old, which is defined as a younger individual age 45-49, on the date last insured. (20 CFR 404.1563).

8. [t]he claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. [t]ransferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10. [t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. [t]he claimant was not under a disability, as defined in the Social Security Act, at any time from October 21, 2004, the alleged onset date, through September 30, 2007,

the date last insured (20 CFR 404.1520(g)).

(Tr. pp. 25, 26, 29, 30).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de</u> <u>novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592

5

(5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1.    an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.    an individual who does not have a "severe impairment" will not be found to be disabled.

3.    an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.    if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5.    if an individual's impairment precludes him from

6

performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the claimant carries that burden and successfully demonstrates that he is unable to perform the work that he has done in the past, the burden of proof shifts to the Commissioner at the fifth step to show that the claimant can perform other work in light of his age, education, work experience, and physical and mental limitations. Kramer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). In determining whether there is other work available that the claimant can perform, the Commissioner may rely exclusively on the Medical-Vocational Guidelines of the Regulations (the "Grids") when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Fraga, 810 F.2d at 1304. Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.

1988); <u>Fraga</u>, 810 F.2d at 1302.

Presumably owing to the fact that the application for DIB that is at issue in this case is not plaintiff's first, the administrative hearing that was held on March 23, 2009 was relatively brief. At the outset of the hearing, the ALJ noted that the previous application for DIB that plaintiff had filed had been administratively denied in March of 2006 and that plaintiff's disability insured status had subsequently expired on September 30, 2007. The ALJ characterized the proceeding before him as plaintiff's objection to a determination by the Administration "... denying multiple applications for [D]isability Insurance Benefits." Various documentary exhibits were then admitted into evidence. Upon being questioned by the ALJ, plaintiff testified that he was not working and that his condition had worsened considerably since the last administrative hearing had been held. Plaintiff still experienced back pain but his neck had become more problematic as a result of a bulging disc and a pinched nerve in the left arm which affected its use, a condition which had existed for two years. Plaintiff also suffered from vascular issues in the legs, having recently undergone surgery and stent placement in the left leg with surgery to the right leg to be scheduled in the next few months. As a result of those issues, plaintiff's doctor had advised him to elevate his legs above his heart. Because plaintiff

already had to lie down three to four times per day to alleviate back and shoulder pain, he used that as an opportunity to elevate his legs as his doctor had directed. (Tr. pp. 12-14).

Lionel Bordelon, a VE, was next to take the stand. He briefly classified plaintiff's past jobs, one of which was a welding mechanic, as involving very heavy work which produced no transferrable work skills. The ALJ then addressed plaintiff's counsel directly, anticipating the argument that, if plaintiff were limited to sedentary-level work, the Grids would direct a finding of "disabled". Counsel acknowledged, however, that plaintiff did not reach the age of fifty until after his insured status had expired, thus making the particular Grid rule inapplicable. Counsel then proceeded to amend the alleged onset date to January 23, 2007, the date of an MRI of the cervical spine which revealed significant stenosis at two levels. In addition, counsel pointed to medical records from December of 2007 which showed claudication in one leg, a subsequent angiogram, blood clots in the lower extremities, bypasses, and other treatment as demonstrating that those problems, when combined with plaintiff' neck issues, had existed before the expiration of his insured status. (Tr. pp. 14-16).

Plaintiff was then questioned further by the ALJ who directed him to the time frame of the fall of 2007. Plaintiff testified

that he was seeing many compensation-funded doctors at the time and that he duly followed their medication and diet recommendations. Plaintiff still smoked although he had cut down considerably. Given plaintiff's birthdate and the date that his insured status had expired, the ALJ posited, plaintiff would have to be incapable of even sedentary work to be found disabled under the Grids. (Tr. pp. 16-17).

The record reflects that plaintiff suffered a workplace injury on October 23, 2003. (Tr. p. 130). He then underwent a lumbar myelogram and CT scan with contrast on November 14, 2003 which reveled a moderate-sized, broad-based, right-sided L5-S1 disc herniation with posterior displacement of the impinged right S1 nerve root and a broad-based midline disc bulge at L3-4. (Tr. pp. 121-124, 158-161). Plaintiff subsequently received a series of lumbar epidural injections on November 25, December 9, and December 23, 2003 which provided significant relief. (Tr. pp. 155-156, 153, 154, 157). He was feeling much better when he was re-evaluated by Dr. Sylvest on January 9, 2004 and expressed a desire to return to work. Plaintiff was discharged and was to return to modified work duty. (Tr. p. 152). By January 27, 2004, plaintiff had experienced an increase in his pain and was having difficulties on the job so a functional capacity evaluation ("FCE") was contemplated and he was limited to light-level work. (Tr. p. 152).

On February 2, 2004, plaintiff underwent an initial evaluation prior to his participation in a work hardening program with his pain level at the time being in the low range. (Tr. pp. 229-230, 130, 170-190). Plaintiff thereafter attended fourteen therapy sessions until his discharge on February 24, 2004 and was then scheduled for a FCE that was to take place the following day. (Tr. pp. 191, 162-168, 137-150). That evaluation went forward as scheduled and resulted in a recommendation that plaintiff be released to return to his previous job as a mechanic without restrictions. (Tr. pp. 192-195, 200-227, 137, 169).

When plaintiff was seen by Dr. Thad Broussard on May 4, 2004, he reported that his attempt to return to work had been unsuccessful and that he had been laid off. Plaintiff experienced persistent back pain at the time that was aggravated by bending, lifting, twisting, and prolonged sitting and standing. The doctor's note from that date indicates that plaintiff had underdone triple bypass surgery in 2001 as well as femoral bypass surgery in 2002. Upon physical examination, plaintiff had generalized tenderness over the low back which limited flexion and extension as well as right and left bending but without spasm. There was no motor point tenderness, weakness, or sensory loss in the lower extremities and vascular status was grossly intact. The impression was lumbar disc disease. Dr. Broussard's recommendation was to

manage plaintiff's symptoms conservatively. (Tr. pp. 273-275). The
doctor subsequently did so over the course of eighteen office
visits which took place on May 18, 2004 through June 13, 2006.
Treatment modalities throughout this time consisted of physical
therapy, injections, and oral medications including Vicodin ES,
Bextra, and Soma. (Tr. pp. 270-272, 267-269).

On August 9, 2004, plaintiff underwent an MRI of the lumbar
spine. That testing revealed annular tears of the posterior margin
of the L3-4 and L5-S1 discs, minimal bulging at L3-4 and L5-S1
without stenosis or impingement, and some mild facet arthropathy at
L3-4, L4-5, and L5-S1. (Tr. p. 302). On August 19, 2004, plaintiff
underwent a second FCE through which it was determined that he
retained the ability to perform light to medium-level work. (Tr.
pp. 276-292, 240-265).

From February of 2005 through February 4, 2009, plaintiff was
seen at the Poche Medical Clinic for a variety of conditions but
the treatment notes from those occasions are rather brief and are
of poor readable quality. (Tr. pp. 361-364). On January 8, 2007,
plaintiff was evaluated by Dr. Scott Petrie in connection with his
complaints of neck and left shoulder pain for the previous three
months which was characterized as episodic, worse with activity,
and at a level of "7" to "8". The assessment was cervical spine
degenerative disc disease/spondylosis/spasm and plaintiff was

prescribed Skelaxin, Celebrex, Ultram, Tylenol, and Vicodin ES. (Tr. pp. 416-417). At a follow-up visit on January 22, 2007, Dr. Petrie noted tenderness over plaintiff's paraspinous muscles into the trapezius and rhomboids primarily on the left but motor skills and sensation were intact and pulses and reflexes were equal bilaterally. The assessment remained unchanged as was the course of treatment and an MRI of the cervical spine was to be scheduled. (Tr. p. 415). That testing went forward the following day which revealed bilateral neural foraminal narrowing which was described as severe at the C5-6 level and moderate to severe at the C6-7 level. (Tr. p. 414).

Plaintiff returned to Dr. Petrie on January 29, 2007 and reported 60% improvement to his condition. The results of the doctor's physical examination were the same. The assessment was cervical spine degenerative disc disease/bilateral neural foraminal stenosis at C5 and C7/spondylosis and plaintiff was continued on his medication regimen along with ice and activity modification. (Tr. p. 413). The results of a subsequent visit with Dr. Petrie on February 12, 2007 were the same and pain management was to be scheduled. (Tr. p. 412). That consultation went forward with Dr. Alpesh Patel on February 19, 2007. By that time, plaintiff's neck and left shoulder pain, at a level of "7" to "8" without medication and "5" to "6" with medications, had been ongoing for some three

months and was affecting the activities of daily living. Upon physical examination, there was pain on deep palpation to the facet joints at four levels of the cervical spine, more on the left than the right, and to the left suprascapular region. Range of motion was restricted more on extension than on flexion but there were no significant motor or sensory deficits in the upper extremities. The impression was chronic neck pain with left upper extremity radicular pain/radiculopathy and cervical spondylosis with bilateral neural foraminal stenosis at the C5 to C7 levels. Plaintiff was administered a suprascapular nerve block and reported significant improvement to his pain which had completely resolved. An interlaminar epidural steroid injection at C6-C7 was to be scheduled. (Tr. pp. 358-360).

Plaintiff's neck pain was characterized as a level "5" when he returned to Dr. Patel on March 15, 2007 and another epidural steroid injection was scheduled as significant improvement had been achieved after the first. (Tr. pp. 356-357). By April 12, 2007, plaintiff's pain had decreased to a level of "4" to "5" out of 10. The impression was chronic neck pain with left upper extremity radiculopathy and cervical spondylosis with bilateral neural foraminal stenosis at C5-6 and C6-7. Plaintiff was prescribed Lortab and received another epidural steroid injection on April 19, 2007. (Tr. pp. 353-354, 352). Despite that treatment, plaintiff's

pain had increased to a level of "6" by May 10, 2007 and to a level of "7" by June 14, 2007 but he had by the latter date exhausted his supply of pain medication. (Tr. pp. 350-351, 347-349). A treatment note from July 31, 2007 is not a model of legibility. (Tr. p. 346). As noted earlier, plaintiff's insured status and consequent entitlement to DIB expired on September 30, 2007.

On November 26, 2007, plaintiff presented himself to the Leonard J. Chabert Medical Center ("LJCMC") Emergency Department complaining of chest pain on exertion and shortness of breath. He was on no medications at the time. The initial diagnosis was chest pain, rule out myocardial infarction, which was accomplished following further testing. The final diagnosis was angina, coronary artery disease, hypertensive heart disease, hyperlipidemia, and peripheral artery disease. Catheterization was deemed warranted in addition to medical management of plaintiff's angina. (Tr. pp. 308-330). Plaintiff was subsequently seen at the L.S.U. Medical Center ("LSUMC") on December 3, 2007 for complaints of exertional chest pain/hypertension/coronary artery disease. He was evaluated and was discharged with a diagnosis of coronary artery disease. (Tr. pp. 452, 334).

Plaintiff apparently underwent cardiac catheterization on December 6, 2007 based on a review of a LSUMC treatment note of December 9, 2007 which documented plaintiff's complaints of right

leg pain, numbness, and a decrease in circulation. The diagnosis was right leg pain. Various tests were run and plaintiff was administered Flovent and Albuterol for treatment of his asthma. (Tr. pp. 423-432, 437). On December 10, 2007, plaintiff returned to LSUMC and an initial diagnosis was made of ilial artery occlusion. The impression was peripheral vascular disease in the lower extremities. Following further cardiac catheterization and angiogram studies of the lower extremities, plaintiff underwent a right iliac and common femoral thrombectomy, a right profunda thrombectomy, a common femoral patch angioplasty, and a right four-compartment fasciotomy. (Tr. pp. 433-436, 438-450, 420, 425, 333).

After he was released from the hospital, plaintiff was seen at the LJCMC Cardiology Clinic on December 18, 2007 for complaints of sharp pain to the bottom of the foot. His ejection fraction rate was 45%. Plaintiff had numbness in his feet but the remaining results of a physical examination were recorded as normal. The assessment was coronary artery disease, peripheral artery disease, asthma, hypertension, and elevated cholesterol. Plaintiff was prescribed Lortab, Ibuprofen, Flovent, Albuterol, and Crestor. (Tr. pp. 305-307). On December 19, 2007, Dr. Lee Arcement of LJCMC authored a "To Whom It May Concern" letter in which he reported having followed plaintiff at the Cardiology Clinic. Dr. Arcement recalled the results of the recent angiogram which revealed 100%

16

stenosis of both the left and right coronary artery, a left internal mammary artery graft to his left anterior descending artery, a right internal mammary artery graft to his obtuse marginal branch, and a radial artery graft to the first diagonal branch. Plaintiff was then on an "extensive medical regimen" that included Lisinopril, Metoprolol, Pravastatin, Aspirin, and Flovent as needed. Dr. Arcement remarked that "[i]n the setting of all his very severe coronary artery disease, significant peripheral vascular disease and comorbities [sic], ... [plaintiff] can no longer work." The doctor noted that despite plaintiff being a "younger gentlemen", he suffered from significant cardiovascular and peripheral vascular disease and that he should not work and should be considered disabled. (Tr. p. 332).

On January 17, 2008, plaintiff underwent spirometric testing at the LJCMC Respiratory Care Department which revealed mild obstruction that was unresponsive to bronchodilator therapy. (Tr. pp. 393-394). Plaintiff completed the Administration's "Function Report-Adult" on February 2, 2008 in which he reported the daily activities that he was capable of. A typical day for plaintiff was fairly sedentary but he did go on walks with his wife although he needed to take frequent breaks. Plaintiff's wife prepared meals for him but he could tend to his personal needs, wash clothes, and cut grass with a riding lawnmower. He could also drive and shop but

hobbies and interests were limited to watching TV and walking short distances. Plaintiff estimated that he could lift only ten pounds and could walk only a half a block before needing to rest. Squatting, bending, standing, reaching, and climbing stairs were all affected by his condition and pain frequently made concentration and task completion difficult. On occasion, plaintiff reportedly used a walker to ambulate which had been prescribed following his most recent surgery in December of 2007. (Tr. pp. 92-100).

On February 14, 2008, an Administration Disability Examiner reviewed plaintiff's file and set forth her findings in a "Physical Residual Functional Capacity Assessment" form. There, the Examiner found that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift/carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could occasionally climb a ramp/stairs/ladder/rope/scaffolds but could frequently perform the remaining postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations. Essentially, plaintiff was found to be capable of performing light-level work. See 20 C.F.R. §404.1567(b). (Tr. pp. 335-342). Bloodwork was conducted on March 10, 2008 which revealed slightly elevated triglycerides and slightly low HDL cholesterol. (Tr. pp. 391-392).

On March 26, 2008, plaintiff was seen at the LJCMC's Internal Medicine/Family Practice Clinic for the purpose of establishing a relationship with a primary care physician and in connection with his complaint of extreme stress. At the time, plaintiff experienced numbness and sharp pain to the right foot at a level of "4". Except for a respiratory deficit, the results of a physical examination were essentially normal. The diagnosis included chronic obstructive pulmonary disease ("COPD"), coronary artery bypass graft, hypertension, tobacco use, hyperlipidemia, peripheral vascular disease, and congestive heart failure with an ejection fraction rate of 45%. Plaintiff was to return to the Clinic on October 1, 2008. (Tr. pp. 388-390). On June 19, 2008, plaintiff underwent a follow-up evaluation at the LJCMC Cardiology Clinic in connection with his previous complaints of shortness of breath with activity and pain and numbness to the bottom of the right foot. Plaintiff had no new complaints at the time. Except for some claudication in the right leg, the results of a physical examination were essentially normal. The assessment included coronary artery disease/coronary artery bypass graft x3, peripheral artery disease, hypertension, elevated cholesterol, and tobacco use. Plaintiff was prescribed various medications, was advised to quit smoking, was counseled on rest and exercise, and was to return to the Clinic in seven months. (Tr. pp. 385-387).

On July 14, 2008, plaintiff underwent various CT studies. Those of the abdominal aorta were essentially normal with no significant side branch stenosis. Studies of the lower extremities revealed bilateral occluded proximal superficial femoral arteries ("SFA") with reconstitution of the distal SFA in the region of the abductor canal, a patent popliteal artery, and bilateral three-vessel runoff to the ankle level. A CT of the abdomen demonstrated a small stone-filled contracted gallbladder without evidence of biliary dilatation. (Tr. pp. 382-384). Plaintiff was next seen at LJCMC on October 1, 2008 for complaints of shortness of breath when walking. Upon physical examination, plaintiff had wheezing with expiration and minimal edema in the right lower extremity. The diagnosis included COPD and tobacco use. (Tr. pp. 379-381).

Plaintiff was next seen at the LJCMC Cardiology Clinic on October 6, 2008 for complaints of dyspnea on exertion and claudication to the lower extremities. Crackles were heard in the chest bilaterally. The assessment was coronary artery disease, coronary artery bypass graft x3, a history of ventricular fibrillation, tobacco use, peripheral vascular disease, and an upper respiratory infection. Prescribed medications included Flovent, Nitroglycerine, Zetia, Proventil, and Chantix. Plaintiff was directed to quit smoking and was to return to the Clinic in six months. (Tr. pp. 376-378).

On October 14, 2008, plaintiff was admitted to the Ochsner Medical Center where he underwent interventional peripheral catheterizations of the ostial left renal artery with stent placement over the course of two days. Plaintiff was ultimately discharged on October 16, 2008 with prescriptions for some fifteen different drugs. (Tr. pp. 395-410). On October 21, 2008, Mark Wright, a family nurse practitioner, completed a "Medical Examiner's Certification of Mobility Impairment" in which he indicated that plaintiff had a permanent impairment in the form of a cardiac condition that imposed functional limitations of a certain severity as established by the American Heart Association. (Tr. pp. 344-345).

Plaintiff was next seen at LJCMC on November 24, 2008 for complaints of chronic low back pain at a level of "6" to "7". The diagnosis on this date was Type II diabetes, controlled hypertension, peripheral vascular disease/coronary artery disease, elevated cholesterol, COPD, and low back pain/neck pain. An MRI of the spine was to be scheduled and plaintiff was to return to the Clinic in three months. (Tr. pp. 373-375). The recommended studies were subsequently performed at LJCMC on December 29, 2008. An MRI of the lumbar spine revealed a posterior midline protrusion at L3-4 with moderate compression of the thecal sac with similar findings at L5-S1 but with resulting mild focal impression on the thecal

sac. An MRI of the cervical spine revealed posterior spondylosis and bulging at C5-6 resulting in effacement of the ventral subarachnoid space with mild flattening of the ventral cord and bilateral uncinate hypertrophy causing moderate to moderately severe bilateral foraminal stenosis. At the C4-5 level, mild right facet arthropathy was suggested. (Tr. pp. 369-372).

Plaintiff returned to the LJCMC Cardiology Clinic on January 21, 2009 with complaints of tightness to the chest with walking and numbness to the right foot and toes. Claudication was present bilaterally but was worse on the right more than the left. The diagnosis included coronary artery disease/coronary artery bypass graft, peripheral vascular disease, diabetes, controlled hypertension, elevated cholesterol, and tobacco use. Various medications were prescribed including Norvasc, Toprol, Crestor, Aspirin, Plavix, HCTZ, Albuterol, Metformin, Nitroglycerine, and Flovent. (Tr. pp. 366-368). On February 9, 2009, plaintiff was seen at the LJCMC Orthopedic Clinic in connection with complaints of low back pain at a level of "6" to "7". Upon physical examination, strength was 5/5 throughout and straight leg raising was negative. The assessment was moderate lumbar/cervical degenerative disc disease and plaintiff was to be referred to the Neurology Clinic. (Tr. p. 365).

The final piece of documentary evidence that was admitted in

the administrative proceedings below is a second "To Whom It May Concern" letter that was drafted by Dr. Arcement on October 20, 2009. In that missive, the doctor recalled plaintiff's most recent office visit on September 22, 2009 at which he complained of dyspnea on exertion with moderate activity and severe right lower extremity pain. Dr. Arcement also recalled plaintiff's history of well-known, extensive peripheral vascular disease with multiple stenting in the lower extremities, severe coronary artery disease requiring bypass surgery in 2002, a history of renal artery stenosis with stent placement in the left kidney, hypertension, diabetes, hyperlipidemia, diastolic heart failure, and left ventricular hypertrophy. Plaintiff additionally suffered from extensive claudication of both lower extremities, the right greater than the left, and was still symptomatic from peripheral vascular disease and diastolic heart failure despite being on an extensive medical regimen. He was to be re-evaluated by the interventional vascular team for further stenting in the lower extremity. (Tr. p. 453).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds. In the third of those, plaintiff argues that the ALJ should have used the Grid rules as mere guidance and applied them in a non-mechanical fashion as set forth in §404.1563(b) to find that he was disabled

as of the date when he was last insured, which was less than six months shy of his fiftieth birthday, in light of his limited education and very heavy past relevant work.

The Regulations utilized by the Commissioner provide that a claimant's chronological age is to be considered in combination with his residual functional capacity, education, and work experience in determining whether he is disabled and is thus entitled to Social Security benefits. 20 C.F.R. §404.1563(a). The Regulations break down age into the following categories: 1) a "younger person" (under age 50); 2) a "person closely approaching advanced age" (age 50 to 54); and, 3) a "person of advanced age" (age 55 or older). 20 C.F.R. §404.1563(c)-(e). Those well-defined groupings notwithstanding, the Regulations provide that the enumerated age categories will not be applied mechanically in a so-called "borderline situation" but will instead be used as follows:

> [i]f you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use that older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. §404.1563(b).

Because the term "borderline" is not specifically defined, the Fifth Circuit has observed that the Commissioner is vested with

24

considerable discretion in determining whether such a situation is present. <u>Harrell</u>, 862 F.2d at 479. Courts construing §404.1563(b) have similarly grappled with the Regulation's temporality element. <u>See</u>, e.g., <u>Vaughn v. Astrue</u>, 2011 WL 1628031 at *5-6 (W.D. Penn. Apr. 28, 2011)(collecting cases); <u>Pettway v. Astrue</u>, 2010 WL 3842365 at *3 (S.D. Ala. Sept. 27, 2010)(same). As a general rule, a person who is within six months of the next higher age category is considered to be in a borderline situation. <u>Florent v. Astrue</u>, 2010 WL 2977617 at *11 n.5 (E.D. La. Jun. 17, 2010), <u>adopted</u>, 2010 WL 2978224 (E.D. La. Jul. 20, 2010).

While there is no <u>per</u> <u>se</u> requirement that an ALJ explain in his written decision why he did not use an older age category, §404.1563(b) specifically mandates that the issue be "considered" such that the record contains enough of an explanation of the ALJ's overall disability adjudication to enable reviewing courts to determine whether the decision is supported by substantial evidence. <u>Bowie v. Comm. of Soc. Sec.</u>, 539 F.3d 395, 400-01 (5th Cir. 2008). Although this can be accomplished by a specific pronouncement by the ALJ or even the AC that the borderline age issue has been considered, <u>Pettway</u>, 2010 WL 3842365 at *5, the ALJ's reliance on the testimony of a VE in assessing the overall impact of all of the factors of a claimant's case will typically suffice. <u>Lockwood v. Comm. of Soc. Sec. Adm.</u>, 616 F.3d 1068, 1071-

72 (9th Cir. 2010), <u>cert</u>. <u>denied</u>, ____ U.S. ___, 131 S.Ct. 2882
(2011)(reliance on VE testimony); <u>Bowie</u>, 539 F.3d at 396 (same);
<u>Stanridge-Salazar v. Massanari</u>, 254 F.3d 70, 2001 WL 502506 at *3
(5th Cir. 2001)(reliance on VE and medical expert testimony);
<u>Underwood v. Bowen</u>, 828 F.2d 1081, 1082-83 (5th Cir. 1987), <u>cert</u>.
<u>denied</u>, 484 U.S. 1029, 108 S.Ct. 758 (1988)(reliance on VE
testimony); <u>Fosha v. Barnhart</u>, 372 F.Supp.2d 948, 956 (S.D. Tex.
2005)(same).

The operative date for plaintiff in the instant case is
September 30, 2007, the date that he was last insured for DIB
purposes. <u>Pettway</u>, 2010 WL 3842365 at *1 n. 2. At that time,
plaintiff was some one hundred fifty-five days shy of being fifty
years old which would have bumped him from the "younger person"
category into the "closely approaching advanced age" category.
According to Rule 201.10, an individual who is limited to sedentary
work, is closely approaching advanced age, has a limited education
or less, and has no transferable work skills is considered to be
disabled. Rule 201.10, 20 C.F.R. Pt. 404, Subpt. P., App. 2.
Citing plaintiff's chronological age of forty-nine on the date that
he was last insured, the ALJ found plaintiff to be a "younger
individual" and thus not disabled under Grid Rule 201.19. (Tr. pp.
29-30). Although a VE was called to testify at the administrative
hearing that was held below, his testimony was limited to the

exertional and skill demands of plaintiff's past work and he was
not asked to opine on whether the plaintiff could work given his
specific age, education, and past work experience. The totality of
that testimony, and the ALJ's subsequent comments bearing on the
issue of plaintiff's age, is as follows:

(The Vocational Expert, LIONEL BORDELON, having been first
duly sworn, testified as follows:

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q: Mr. Bordelon, was any of the prior work done at the
sedentary exertional level?

A: No, sir.

Q: Did any of the prior work generate skills which would
transfer in the proper fashion to the jobs at the
sedentary exertional level?

A: No, sir, unfortunately, sir, both are very heavy.

Q: Heavy?

A: Welding mechanic.

ALJ: All right. As far as you know, Mr. Breaux, do I have all
the medical that would pertain to the period – –
subsequent to the prior denial and the expiration of
insured status or thereabouts?

ATTY: Yes, Your Honor.

ALJ: And your argument would be then that that would represent
sedentary instead of light in which case [A]ppendix II
would direct a finding of disabled?

ATTY: The only problem with that argument would be at the
age of 50 would be after the date last insured.

ALJ: It is.

27

ATTY:      March 3rd, 2008.

ALJ: You are correct.

(Tr. pp. 14-15).

Apparently believing that plaintiff's chronological age on the date that he was last insured controlled and was not subject to exception, counsel thus argued in the alternative that plaintiff's vascular problems existed prior to September 30, 2007 and established his disability when combined with his neck difficulties. (Tr. pp. 15-16). After briefly questioning plaintiff on his condition as it existed in the fall of 2007, the ALJ remarked at the conclusion of the hearing as follows:

ALJ: All right. So because of the way the age, the birth day falls and the date last insured falls, you would have to have a less than sedentary then to support an award.

ATY: Yes, Your Honor, it's a tricky set of facts and circumstances in this case.

(Tr. p. 17).

As noted above, the ALJ subsequently found plaintiff not disabled by applying Grid Rule 201.19 rather than relying upon the testimony of a VE. From a review of his written decision, the ALJ failed to articulate a non-mechanical conclusion about which age category was appropriate for plaintiff nor did he state whether he considered the borderline-age issue at all. <u>See</u> <u>Anderson v. Astrue</u>, 2011 WL 2416265 at *14 (N.D. Ill. June 13, 2011). Based upon the comments of the ALJ at the administrative hearing, it does

not appear that he was aware of his discretion to categorize plaintiff in an older age grouping.  See, e.g., <u>Corbin v. Astrue</u>, 2009 WL 799268 at *12 (E.D. Cal. March 23, 2009).  The AC made no specific mention of the borderline-age issue either. Unlike the claimant in <u>Harrell</u>, categorizing plaintiff in an older age group may have changed the outcome of his case.  <u>Harrell</u>, 862 F.2d at 479.  Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for further consideration of that issue. <u>Daniels v. Apfel</u>, 154 F.3d 1129, 1135 (10th Cir. 1998).  Of course, it will be up to the ALJ in the first instance to determine whether plaintiff has additional vocational adversities that would support the use of the higher age category.  <u>Vaughn</u>, 2011 WL 1628031 at *6.[3]/

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further consideration consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

---

[3]/ In light of the Court's recommendation herein, a discussion of plaintiff's first two challenges to the Commissioner's decision is pretermitted.

factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this  22nd  day of ___February___, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE